515 P.2d 865

**The STATE of Arizona, Appellee,**

v.

**Donnell THOMAS, Appellant.**

**No. 2199.**

Supreme Court of Arizona,
In Banc.

Nov. 7, 1973.

Rehearing Denied Dec. 11, 1973.

Gary K. Nelson, Atty. Gen., by Paul J. Prato, Former Asst. Atty. Gen., Phoenix, for appellee.

Messing, Hirsh & Franklin by Robert J. Hirsh, Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal by the defendant, Donnell Thomas, from a jury verdict and judgment of guilt to the crime of first degree murder, §§ 13–451 and 452 A.R.S., with a sentence of death thereon, § 13–453 A.R.S.

Omitting questions concerning the death penalty, defendant asks that the following questions be answered on appeal:

1. Was it a violation of the confrontation clause of the Sixth Amendment of the United States Constitution and Rule 256 of the Arizona Rules of Criminal Procedure (1956), 17 A.R.S., to allow the State to use the testimony of a witness given at a previous trial when that witness was available at the second trial but when called to testify stated that he did not remember any events to which he had previously testified?

2. Under the facts in this case, was it reversible error for the trial court to refuse to admit into evidence a document impeaching a State's witness

and also to prevent defendant from cross-examining a State's witness as to his motive and interest for testifying?

3. Was it reversible error to admit into evidence, four photographs of the deceased's nude body on a morgue slab during the course of an autopsy, showing wires protruding from the various openings in the body?

4. Was it reversible error and abuse of discretion for the trial court to allow the State to reopen its case after both the State and the defense had rested and the matter was ready to be submitted to the jury?

5. Was it reversible error for the Deputy County Attorney Horton Weiss to: (a) make repeated and improper offers of evidence, knowing the evidence to be inadmissible; (b) make continued objections to defense attorney's cross-examination of State's witnesses, thereby preventing the defendant from exercising his right of confrontation; (c) make repeated objections on direct examination of defense witnesses to prevent any continuity of testimony coming from defense witnesses; and (d) willfully and knowingly suppress evidence beneficial to the defense case and/or inconsistent with the State's theory of the case?

The facts necessary for a determination of this matter on appeal are as follows. On 4 October 1969, Mason Branch, a clerk at the Crown Liquor Store in Tucson, Arizona, was shot and killed during the course of an armed robbery. After investigation, the Tucson police obtained arrest warrants for the defendant Donnell Thomas as well as David Williams, Robert Skinner, and Paul Wright. David Williams entered a plea of guilty and was given the death penalty which plea and sentence was set aside on appeal. State v. Williams, 107 Ariz. 421, 489 P.2d 231 (1971). Williams again plead guilty to first degree murder and was sentenced to life imprisonment. Paul Wright was tried and found guilty of voluntary manslaughter, armed robbery, and conspiracy. He was given probation. Robert Lee Skinner was tried and convicted of first degree murder and armed robbery, and sentenced to life imprisonment. He appealed and the verdict, judgment and sentence were affirmed. See State v. Skinner, 110 Ariz. 135, 515 P.2d 880, filed this day.

The defendant Thomas was arrested in Oakland, California, on 6 November 1969. He admitted that he had spent most of the day of the murder with the codefendants Skinner, Williams, and Wright, and that he, Thomas, had been in the Crown Liquor Store on the night of the murder, but he denied any knowledge or involvement in the robbery and homicide. After a mistrial as a result of a "hung" jury, Thomas was tried again, convicted, and sentenced to death.

The State contended that Thomas shot Branch five times during a robbery committed by Thomas and the three other men. Damaging evidence of the defendant's participation in the crime was given by Gilbert Alzua who testified that, while both were inmates of the county jail, the defendant had admitted killing Branch and robbing the store, and by the admission of testimony given at the first trial by Lucius Sorrell, an inmate of the Arizona State Mental Hospital and a user of heroin and LSD.

The prior testimony of Sorrell indicated that Thomas came to Sorrell's apartment and asked to borrow a gun to "pull a job." Thomas left without the gun and returned shortly to tell the witness that he didn't need to borrow the gun because he "already had one." Also, in his prior testimony, Sorrell stated that he saw Thomas and three other men running through a park near his apartment and a short distance from the liquor store about the time of the robbery and murder.

On cross-examination at the first trial, Sorrell said that he was unable to see Thomas clearly, but recognized him by his

124

build and a hat he was wearing. He said that his inability to see from one eye and the darkness did not prevent him from observing accurately.

## ADMISSION OF SORRELL'S PREVIOUS TESTIMONY

When Sorrell was called as a witness for the State he said he did not remember the events of 4 October 1969 surrounding the crime, nor did he remember the defendant or the other men accused of responsibility for the robbery and murder. The Deputy County Attorney, over the objection of the defendant's attorney, sought to introduce Sorrell's prior testimony given at defendant's first trial, at which time Sorrell had testified extensively and had been subjected to cross-examination by defendant's attorney. Prior to admission of this testimony, the court questioned Sorrell as follows:

"THE COURT: Before we go any further, the Court has a couple of questions of the witness, Gentlemen.

### EXAMINATION

"BY THE COURT:

"Q Mr. Sorrell, are you nervous at the present time?

"A Who?

"Q Are you nervous now?

"A I get nervous off and on.

"Q Are you nervous now?

"A (No audible response.)

"Q Do you always shake that way?

"A I don't know. I don't always shake.

"Q Are you upset, Mr. Sorrell?

"A Yeah, I am getting upset.

"Q What are you getting upset about?

"A Because I told them yesterday, he come talked to me yesterday, and I told him yesterday how it was and tried to explain something to him, and he stood up and listened, but then he come back with the same thing today and I tell him I don't care what he would do, I just

didn't know nothing, that was it. I mean, I am more confused and mixed up. I keep going through all these questions and things I don't know, just mess me up is all.

"Q Are you confused or are you frightened, Mr. Sorrell?

"A I get confused and mixed up.

"Q Are you frightened?

"A No.

"Q Has anybody made any threats to you that if you testify, anything will happen to you?

"A No.

"Q You just are all mixed up, you can't remember anything; is that your position?

"A Don't remember.

"Q Sir?

"A I mean—

"Q You are confused, you don't remember anything; is that your situation here today?

"A Yeah.

"Q These questions that these lawyers have been asking you, you don't recall any of the events that they are talking about?

"A What they would ask me?

"Q Yes, sir.

"A No, I don't know.

"Q Why does it take you so long to answer a question? I think the record ought to show at this time that every question that is asked of the witness there is a long pause while he ponders the question. Why do you do that, Mr. Sorrell?

"A I don't know, mixed up.

"Q Sir?

"A I don't know. I am just mixed up.

"Q Do you know where you are now?

"A Yeah, I am at the courtroom.

"Q You are in a courtroom, you understand that?

"A Yes, court.

"Q   Do you understand that Mr. Don-nell Thomas is on trial here today; do you understand that?

"A   Well, I understand he is on trial?

"Q   Yes.

"A   Yeah.

"Q   Did you ever testify before in a trial wherein Mr. Thomas was on trial?

"A   I don't remember.

"Q   You don't remember. So if we ask you any questions about any testi-mony you might have given at an-other trial of Mr. Thomas you wouldn't know anything about it?

"A   No, I couldn't recall.

"Q   You don't recall ever coming down to testify in a trial where Mr. Thomas was on trial?

"A   Like I say, the only one I remember is when I was in that other build-ing, when I came down and was in the other building over there.

"Q   You mean on the other end of this building?

"A   (No audible response.)

"Q   Was that a Preliminary Hearing?

"A   I don't know what it was. They know what it was. I don't know what it was.

"Q   Was it while you were in the hospi-tal they brought you down here or did they take you to the hospital from that hearing?

"A   They, did they brought me down?

"Q   They brought you down from the hospital?

"A   Yeah.

"Q   That's the only other trial that you remember?

"A   Uh-huh.

"THE COURT:   Very well. I have no other questions, Mrs. Weiss."

It was apparent that the witness was ei-ther mentally incapable of testifying as to the events to which he previously testified or was refusing to testify. The court ruled that "it is obvious that the man is in-capable of testifying," and over timely objections by defendant admitted the prior testimony on the grounds of present incom-petence of the witness.

The right to confrontation granted to defendants by the Sixth Amendment to the United States Constitution is also a valuable right for the trier of fact, allow-ing the witness's demeanor to be observed and his credibility weighed. Government v. Aquino, 378 F.2d 540 (3rd Cir. 1967). The United States Supreme Court has based its decisions on admissibility of prior testimony primarily on the opportunity to cross-examine at the time the prior testi-mony was taken, Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), or, if the witness is available, on the opportunity to cross-examine the wit-ness at the trial in which the prior testimo-ny or statement is admitted. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L. Ed.2d 489 (1970); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). In the instant case it is immateri-al for the purposes of the confrontation clause of the United States Constitution whether the witness could be available for cross-examination at the second trial or not. His testimony at the prior trial of the same defendant upon the same charge was subject to cross-examination by defendant at that time and was, for Sixth Amend-ment purposes, admissible.

The defendant contends, however, that Rule 256 of the Rules of Criminal Proce-dure (1956), 17 A.R.S., which governs ad-missibility of prior testimony is the exclu-sive test of admissibility in Arizona.

Rule 256 provides as follows:

"When in any court of record the testi-mony of any witness in a criminal action is reported by an official court reporter and certified by him to be correct, and thereafter the witness *dies or is beyond the jurisdiction of the court* in which the action or proceeding is pending and his absence is not procured by the party of-fering the evidence either party to the

record may read in evidence the testimony of the witness in any subsequent trial or proceeding had in the same action or proceeding subject only to the same objections that might be made if the witness were testifying in open court." (Emphasis added)

Tom Reed Gold Mines Co. v. Moore, 40 Ariz. 174, 11 P.2d 347 (1932), interpreted the civil rules' counterpart of what is now Rule 256 and found that only where the witness was dead or beyond the jurisdiction of the court would prior testimony be admitted:

" * * * If such testimony may be used in an entirely different action, notwithstanding the statute limits its use to 'any subsequent trial of or proceeding had in the same action,' then it could be extended to include the testimony of witnesses who have since become insane or are for any reason inaccessible, although the statute limits it to the testimony of witnesses who have *died or who are beyond the jurisdiction of the courts,* etc. * * *" 40 Ariz. at 182, 11 P.2d at 349.

In Adkins v. State, 42 Ariz. 534, 28 P.2d 612 (1934), the court construed Section 5058, Revised Code 1928, which is substantially the same as the current Rule 256. We said, in response to the argument that the court should have admitted testimony of an absent witness who was ill in Williams, Arizona:

"We fail to find any error in this refusal as it was not a matter of discretion of the trial court, but purely a matter of law, which is provided by section 5058, Revised Code 1928, which is to the effect that where a witness is beyond the jurisdiction of the court, or is dead, and where his testimony has been reported by an official court reporter and certified to by him to be correct, then either party may read the evidence of such witness in any subsequent trial." 42 Ariz. at 542, 28 P.2d at 615.

It would appear from the dicta in Tom Reed Gold Mines Co. v. Moore, supra, and the holding in Adkins v. State, supra, that Rule 256 limits the admissibility of prior testimony of a previous trial with the same parties and issues solely to the situation wherein the witness is either dead or beyond the jurisdiction of the State. We do not believe that Rule 256 is so limiting. Rather, we believe that Rule 256 is a permissive rule specifically allowing the introduction of previous testimony when the conditions of Rule 256 are met, and not so restrictive as to preclude the admission of previous testimony when, as here, for example, the witness through no fault of the party offering the prior testimony refuses or is incapable of testifying even though present in court. We agree with the rationale of the Colorado court:

"The general rule at the common law was that where a witness who had testified at a prior trial was unavailable at the time of the second trial, his testimony at the former trial once properly authenticated was admissible in the latter trial. Johnson concedes this to be the rule, but contends that Sides was not 'unavailable', but on the contrary not only 'available' but actually present in court.

"A somewhat parallel situation is presented in State v. Stewart, 85 Kan. 404, 116 P. 489, where a witness for the State in a prosecution for murder was physically present at the trial but refused to testify. In permitting the introduction of the testimony given by that witness in a preliminary examination into the charge on which the accused was then on trial, the Kansas Supreme Court said that the true test was not so much the 'unavailability' of the witness, but the 'unavailability' of his testimony and that a witness who—though present— refused to testify is just as surely 'unavailable' as the witness who stepped across a state line to avoid service of a subpoena. We approve of this rationale and hold that under the circumstances there was no error in using the former testimony of Revelo Sides. * * *" Johnson v. People, 152 Colo. 586, 384 P.

2d 454, 457 (1963). See also People v. Pickett, 339 Mich. 294, 63 N.W.2d 681, 45 A.L.R.2d 1341 (1954).

Our position in this regard is buttressed by Rule 30 of the Rules of Criminal Procedure (1956) concerning the admissibility of testimony taken at a preliminary hearing which reads:

"B. When a witness has been examined as provided in Rule 23 and his testimony taken as provided in Rule 28, such testimony may be admitted in evidence upon the trial of the defendant for the offense for which he is held, either on behalf of the state or the defendant, if for any reason the testimony of the witness cannot be obtained at the trial and the court is satisfied that the inability to procure such testimony is not due to the fault of the party offering it." Rule 30 subd. B, Rules of Criminal Procedure (1956), 17 A.R.S.

■ It would seem strange indeed to allow testimony from the preliminary hearing to be admitted when the witness is present and refused to testify, see State v. Dixon, 107 Ariz. 415, 489 P.2d 225 (1971), and yet not allow the testimony from a former trial on the same issues with the same party. So much of the statements in Tom Reed Gold Mines Co. v. Moore, supra, and Adkins v. State, supra, as may appear to be contrary, are by this opinion overruled. We hold the prior testimony of the witness Sorrell under the facts in this case was admissible. (See Rule 19.3, subd. c, Arizona Rules of Criminal Procedure, 1973, not in effect at the time of the trial in the instant case.)

■ Defendant also complains that the court erred in allowing the County Attorney to lead the witness Sorrell while attempting to get him to testify. The trial court has wide discretion in allowing the parties, upon an adequate showing, to examine a called witness as a hostile witness. State v. Narten, 99 Ariz. 116, 407 P.2d 81 (1965); State v. Michael, 103 Ariz. 46, 436 P.2d 595 (1968). In the instant case, the witness was refusing or was unable to tes-

tify and the trial court allowed the County Attorney to cross-examine as a hostile witness including leading questions. We find no error in the trial court's ruling.

## IMPEACHMENT AND CROSS-EXAMINATION OF THE WITNESS ALZUA

Gilbert Alzua testified that after Thomas was transferred to the Pima County Jail, Thomas admitted to Alzua that he, Thomas, took part in the robbery and he shot Branch himself. On cross-examination it was brought out that Alzua had been convicted of three felonies prior to his arrest for the fourth which placed him in the jail with Thomas. After Alzua's statement to the police, charges of embezzlement were continued indefinitely and Alzua was released on his own recognizance. Horton Weiss, the prosecutor in the instant case, was also the prosecutor in the Alzua case.

Alzua testified that he had been released on bond but later stated that he might have been released upon his own recognizance. Alzua also stated his attorney posted bond for him.

■ The defense attempted to introduce a record from the Justice Court which indicated that Alzua was released on his own recognizance and his case continued indefinitely. This offer was objected to by the State and the objection was sustained.

Defendant states in his brief:

"* * * It was very important for the defense to show that Alzua was in fact released on his own recognizance, without the objection of Mr. Weiss, contrary to the testimony given by him. It was further significant to show that Alzua's case had been continued indefinately on the same day that he had given a statement to the Police."

We believe that the evidence was admissible in that it indicated that the witness might be receiving preferred treatment in return for his very damaging testimony against the defendant.

"The rule is well settled in this jurisdiction that a cross-examiner should be given great latitude in his questions which seek to impeach an adverse witness being examined and it is always proper to inquire as to the motive of the adverse witness in testifying and to show any matter which bears on the credibility of that witness. (citation omitted) And a party against whom a witness is produced has a right to show everything which may in the slightest degree affect his credibility * * *.

"While it is true that the extent of such cross-examination is within the sound discretion of the trial judge; nevertheless, if the trial judge has excluded testimony which would clearly show bias, interest, favor, hostility, prejudice, promise or hope of reward, it is error and will be ground for a new trial. * * *" State v. Holden, 88 Ariz. 43, 54, 55, 352 P.2d 705, 713, 714 (1960).

We do not find, however, that the exclusion was prejudicial. The defense was able, through the testimony of Alzua's attorney, to bring before the jury the same information:

"Q Have you had an opportunity in connection with that charge to have those charges continued indefinitely?

"MR. WEISS: Object. Immaterial and irrelevant.

"THE COURT: No, objection overruled. He may answer.

\* \* \* \* \* \*

"THE WITNESS: The final arrangements were made in the latter part of January of 1970.

"MR. CARTIN:

"Q In connection with that, was Mr. Alzua released on his own recognizance?

"MR. WEISS: Object. Immaterial and irrelevant.

"THE COURT: Objection overruled. He may answer.

"THE WITNESS: As to that charge, yes.

"MR. CARTIN:

"Q Now what was the arrangement as far as you know regarding the pending charges that you represented Mr. Alzua on?

"MR. WEISS: Object. Immaterial and irrelevant. He already said they were continued indefinitely. This is his business why he did this. No probative value in this case.

"THE COURT: I am going to overrule the objection.

"THE WITNESS: The question is why did—

"MR. CARTIN:

"Q What was the arrangement?

"A What arrangements were made?

"THE COURT: Would you read the question, George.

(The last question read back by the court reporter as follows:

'Question: What was the arrangement?')

"MR. WEISS: Object on another ground. Have to be hearsay, and it would be immaterial and irrelevant anyway unless Alzua had something to do with it.

"THE COURT: May well be. I may strike it after I hear the answer. You may answer.

"THE WITNESS: I had discussions with the County Attorney's Office regarding the dismissal of the theft by embezzlement charge against Mr. Alzua. I asked them in exchange for the dismissal and in exchange for putting in a good word for Mr. Alzua if I should so request it in another jurisdiction if they would be willing to have him testify as he had previously indicated that he would do and the testimony was to be in regard to a murder case of some sort.

"MR. CARTIN:

"Q With whom from the County Attorney's Office did you have this arrangement?

"MR. WEISS: Object. Immaterial and irrelevant.

"THE COURT: No, objection overruled. He may answer.

"THE WITNESS: I spoke primarily with John Neubauer, and on one occasion I spoke to Mr. Weiss."

And:

"MR. CARTIN:

"Q Did you talk to Mr. Alzua about the arrangements that had been made?

"MR. WEISS: Object to that. Immaterial and irrelevant. It's within the realm where it has no probative value here and it would be hearsay.

"THE COURT: No, objection overruled. He may answer.

"THE WITNESS: I talked to Mr. Alzua on a number of occasions, Mr. Cartin. The discussions with him occurred over a period of several weeks, perhaps as much as a month. And in essence, I told him that I was trying to make the best arrangements I could on his behalf in regard to the charges pending against him, not only in this jurisdiction but in another jurisdiction."

And:

"Q Was part of the arrangement for Mr. Alzua he would be released on his own recognizance on your motion without opposition?

"MR. WEISS: Object to that. No foundation for whatever arrangements were made for whatever purpose they were made or anything else. No foundation for this question.

"THE COURT: Objection overruled. He may answer.

"THE WITNESS: Part of the arrangements were that Mr. Alzua would be released on the theft by embezzlement charge on his own recognizance, yes.

"MR. CARTIN:

"Q Was it your understanding eventually those charges would be dropped?

"MR. WEISS: Object as to what is to happen. Has absolutely no probative value, speculating, opinions and conclusions.

"THE COURT: Objection overruled. He may answer.

"THE WITNESS: Yes, I expect the charges to be dropped at my request."

Defendant also complains that he was unduly limited in cross-examining the witness Alzua by "a battery of objections" made by Mr. Horton Weiss for the State. We note, however, in the complete transcript that many of the objections were sustained. We find no error or undue limitations on the defendant's right to cross-examine the State's witness Alzua.

## PHOTOGRAPHIC EVIDENCE

A pathologist testified as to the injuries which caused the death of Branch and the State sought admission of four pictures of the deceased on the autopsy table with wire probes jutting out of the nude body in the places where bullets entered and exited. The following transpired:

"Q Doctor, I am going to show you State's Exhibits 24, 25, 26 and 27 for identification and ask you to look at these photographs without showing them to the jury, if you please. Do you recognize the person in those photographs?

"A Yes, sir.

"Q Who is it?

"A This is the body of Mason Branch.

"Q Is this the person you had occasion to perform an autopsy on?

"A Yes, sir.

"Q Referring to State's Exhibits 24, 25, 26 and 27, would it assist you in explaining and illustrating your testimony to use these photographs?

"A Yes, sir.

"MR. WEISS: I am going to offer 24, 25, 26 and 27 at this time, Your Honor.

"THE COURT: Very well.

"MR. CARTIN: Your Honor, I am going to object at this time to the use of these photographs. I believe the report that he used, I don't think he needs them. I think they are prejudicial. No relevancy to this defendant.

"MR. WEISS: I might ask one more question.

"Q Doctor, with regard to State's 24, 25, 26 and 27, in order to illustrate your testimony with regard to your autopsy of Mason Branch does it require all of these four photos?

"A Yes, sir.

"THE COURT: Very well. Objection is overruled. Exhibits 24, 25, 26 and 27 may be admitted."

The defense counsel contended that the autopsy pictures admitted over objection had no relevance to any issue in the case and should have been excluded. He argued that, since the manner and circumstances of Branch's death were not contested, the photographs had no probative value.

There are many theories which allow admission of photographs of a corpse in a homicide prosecution. They have been held admissible to prove the corpus delicti, State v. Lindsay, 77 Wyo. 410, 317 P.2d 506 (1957); to identify the victim, State v. Robinson, 89 Ariz. 224, 360 P.2d 474 (1961); to show the nature and location of the fatal injury, State v. Robinson, supra; to help determine the degree or atrociousness of the crime, People v. Keeling, 152 Cal.App.2d 4, 312 P.2d 407 (1957); to corroborate state witnesses, State v. Hudson, 38 N.J. 364, 185 A.2d 1 (1962); to aid the jury in fixing the punishment, State v. Sherrick, 98 Ariz. 46, 402 P.2d 1 (1965); to illustrate or explain testimony, People v. Dugger, 179 Cal.App.2d 714, 4 Cal.Rptr. 388 (1960); and to corroborate the State's theory of how and why the homicide was committed, Burgunder v. State, 55 Ariz. 411, 103 P.2d 256 (1940).

■ The trial court has a considerable measure of discretion in admitting or excluding gruesome pictures, and it is no valid objection that such photos may be inflammatory or prejudicial, for one cannot exclude otherwise competent evidence of a gruesome or unpleasant occurrence simply because it may arouse emotions. Young v. State, 38 Ariz. 298, 299 P. 682 (1931).

■ The defense cites State v. Beers, 8 Ariz.App. 534, 448 P.2d 104 (1968) and State v. Makal, 104 Ariz. 476, 455 P.2d 450 (1969), cert. den., 404 U.S. 838, 92 S.Ct. 128, 30 L.Ed.2d 71, as authority for exclusion of the pictures. The court in Beers, supra, said that the duty of the trial court is "to weigh the danger of prejudice to the defendant, against the probative value of the evidence." Where the "photographs are so inflammatory as to outweigh their probative value," the appellate court should reverse the trial court.

In Makal, supra, this court said, " * * * Where as here there was substantially no controversy concerning the commission of the offenses, there was no significant reason for their admission into evidence. The photographs were highly inflammatory, without any particular saving purpose, and could only have tended to prejudice the defendant in the minds of the jurors * * *."

■ Here the pictures, though admittedly inflammatory, did serve the purpose of explaining the autopsy and the paths of the bullets. We find no abuse of discretion in admitting them into evidence.

## REOPENING OF THE STATE'S CASE

At the end of the defendant's case, the following transpired:

"MR. CARTIN: Your Honor, the defense rests.

"THE COURT: Thank you, sir. Mr. Weiss, any rebuttal witnesses?

"MR. WEISS: One moment while I ponder this surprise.

"THE COURT: Very well.

"MR. WEISS: State will rest."

The court then admonished the jury to be ready to deliberate on the following day.

On the next morning the following occurred out of the presence of the jury:

"MR. WEISS: At this time, Your Honor, the State would move to reopen its case for two witnesses which the State would call. * * *

* * * * * *

"THE COURT: What evidence do you propose to show by way of these witnesses?

"MR. WEISS: The evidence that I propose to show is, I would say that Mr. Jed Jurkowitz was put under the Rule by defense counsel and testified on behalf of the defense last time.

"MR. CARTIN: Your Honor, I object. That has nothing to do with this case what I did.

"MR. WEISS: And that I fully expected defense counsel to put him on this time in his case, as I expressed my surprise yesterday when he rested. Mr. Jed Jurkowitz will testify that he was in Crown Liquor Store between 8:40 p. m. and 8:50 p. m. on the night of October 4th, 1969, and that when he was there Mason Branch was alive. Now this becomes very material and relevant because of the obvious theory of Mr. Cartin that in all his case he has directed toward Mr. Earley Reece. And it becomes important to the State because these times are vital.

The other witness, Jay Hoegner, will testify that he arrived in the store and made the call to report the incident at 8:54 and that immediately after he placed that call is when Mr. Schwartz went back to the body the second time and, which would be the time that he touched this cigarette which was on the floor. And the time elements are important, and I think the Court well recognizes the importance of the time.

His theory is Reece committed it or Reece was there at the time are certainly important to the jury to consider the times as well as any other times that have come forth. And that is what the State intends to put on with these two witnesses, very vital time-wise.

"THE COURT: Both of these witnesses have testified before to the same matters that you are now calling them to testify to?

"MR. WEISS: Jed Jurkowitz testified for the defense last time.

"MR. CARTIN: Object, Your Honor. That is not the question he asked you.

"THE COURT: That's right. My question was, have they testified before in this matter to the same matters that you now propose to show?

"MR. WEISS: Well, J. Hoegner testified to more than I intend to show. He testified—

"THE COURT: Did he testify to the matter that you are going to bring him on here today? Don't tell me how to make a watch if I ask you the time, Mr. Weiss. Just answer my question.

"MR. WEISS: In rebuttal to the defendant's case last time, as a rebuttal witness.

"THE COURT: Did he testify to these matters that you are now going to bring him on to testify about?

"MR. WEISS: Yes.

"THE COURT: That is my question. I just wanted a yes or no.

"MR. WEISS: Yes.

"THE COURT: Very well. The motion is granted. Would you bring the jury in, please."

A motion to reopen is addressed to the sound discretion of the trial court. State v. Boodry, 96 Ariz. 259, 394 P.2d 196 (1964); State v. Moreno, 92 Ariz. 116, 374 P.2d 872 (1962). In the instant case the witnesses called had both testified at the previous trial and the de-

**132**

fense was not surprised by their testimony. We do not find that the trial court abused its broad discretion in allowing the State to reopen.

## MISCONDUCT OF PROSECUTOR

The defendant assigns error to the conduct of the Deputy County attorney, Mr. Horton Weiss, because of (a) improper offers of evidence, (b) frequent objections to cross-examination of the State's witnesses which denied the right of confrontation, (c) frequent objections which prevented defense counsel from developing continuity of direct examination of defense witnesses, and (d) failure to disclose evidence inconsistent with the State's theory of the case.

■ Defendant first contends that the County Attorney committed misconduct by making offers of evidence knowing the evidence to be inadmissible. The evidence specifically objected to was a prior statement of the witness Alzua not for the purpose of impeachment but to bolster the witness's testimony. For example:

"BY MR. WEISS:

"Q  Mr. Alzua, did you give the police a written statement regarding your knowledge or the information you had about the Crown Liquor Store?

"A  Yes.

"Q  Going to show you State's Exhibit 52 for identification, Mr. Alzua, a document, an exhibit consisting of two pages, and ask if you recognize that particular exhibit.

"A  Yes.

"Q  Is that the statement you gave to the police regarding your knowledge of or information regarding Crown Liquor Store?

"A  It is.

"Q  No do you recall the date that you gave this statement to the police?

"A  The 17th of December.

"Q  Before the 17th of December and before the giving of this formal written statement did you have oc-

casion to contact a police officer or tell a police officer that you had information regarding Crown Liquors?

"A  Yes.

"Q  Where was that?

"A  In the county jail.

"Q  Do you recall who the officer was?

"A  Sergeant Ridgely.

"Q  This statement was given to other officers of the police department?

"MR. CARTIN: Objection, Your Honor. That is hearsay as what other officers did with the statement.

"THE COURT: That wasn't the question. Objection overruled.

"THE WITNESS: Yes.

"MR. WEISS: I am going to offer State's Exhibit 52 for identification at this time, Your Honor.

"THE COURT: Very well.

"MR. CARTIN: I am going to object to it, Your Honor. It has no place in this trial. He testified to what is in it. It is not a written signed statement by the defendant, Donnell Thomas, and it is immaterial.

"THE COURT: I am going to sustain the objection."

While we may question the trial tactics of Mr. Weiss, a more timely objection by defendant's attorney would have been helpful and we find no prejudice in the instant case.

■ Second, the defendant contends that continued objections to defendant's cross-examination of the State's witnesses prevented the defendant from exercising his right of confrontation. The defendant's position in the present case is that the objections were so frequent that the right to confrontation was destroyed. We are referred to only a "reading of the entire transcript" which we have done.

We find that most of those objections on cross-examination were sustained, and properly so, by the trial court. We have

not been able to find any witness for the State whom defense counsel was unable to confront fully and defendant in his brief does not direct us to any specific instances. We find no error.

The third point raised by the defendant is that the Deputy County Attorney's "continued and repeated objections to appellant's questions on direct examination prevented appellant from developing any continuity on his direct examination." Specifically, we are directed to the testimony of Kevin Breslin.

On the thirteen pages of direct examination Mr. Weiss made 30 objections to questions asked by defense counsel, 23 of which were overruled. He also made seven other interruptions.

At one point the following exchange took place:

"Q Are you required by law to keep that document?

"A Yes.

"Q What is the document?

"MR. WEISS: Object. Immaterial and irrelevant. May we approach the bench?

"THE COURT: You may.

(Discussion between Court and counsel at the bench not reported.)

"MR. CARTIN: Would you read back the last question, Mr. Reporter? (The last question read back by the court reporter as follows: 'Question: What is the document?')

"MR. WEISS: Object. Immaterial and irrelevant.

"THE COURT: Objection overruled.

"MR. WEISS: Insufficient foundation.

"THE COURT: He may answer.

"THE WITNESS: Could you repeat it, please.

"THE COURT: What is the document?

"THE WITNESS: Under the Gun Control Act of 1968 we have to keep a record of all ammunition sold during the course of business.

"MR. WEISS: Object. Immaterial and irrelevant.

Request it be stricken.

"THE COURT: No, the objection is overruled. The motion is denied. The answer may stand.

"MR. CARTIN: Your Honor, I would at this time offer in evidence Defendant's Exhibit 'E' under the Business Records Act. I would request that the copy be made, offered, rather than the original.

"MR. WEISS: Going to object.

"MR. CARTIN: If possible.

"MR. WEISS: Object to that on several grounds. First of all it's hearsay. Secondly, there is insufficient foundation. Thirdly, it's immaterial and irrelevant to the issues here. There hasn't been any foundation to establish in any of these areas.

"THE COURT: I am going to sustain the objection to the foundation, Mr. Cartin.

"MR. CARTIN:

"Q The Defendant's Exhibit 'E' for—what are the dates of purchases that this covers?

"MR. WEISS: Object. Immaterial and irrelevant.

"THE COURT: Objection overruled.

"THE WITNESS: June the 13th, 1969, through June 15th of 1969.

"MR. CARTIN:

"Q Does that document reflect the names of individuals purchasing ammunition?

"MR. WEISS: I am going to object. It hasn't been sufficient foundation for anything, and he is testifying from what the document contains. By the time—

"THE COURT: What?

"MR. WEISS: My objection is—

"THE COURT: What foundation are you talking about, Mr. Weiss?

"MR. WEISS: He hasn't even laid foundation to make it material and relevant at this point, and it's hearsay besides.

"THE COURT: Well, what was your question, Mr. Cartin?

"MR. CARTIN: I don't remember, Judge.

"THE COURT: I don't either. Objection overruled. He may answer.

"THE WITNESS: Yes, it does.

"MR. CARTIN:

"Q Does it reflect the name E. Reece?

"MR. WEISS: That is a leading question, Your Honor. I object. It isn't even in. It's hearsay and a leading question.

"THE COURT: Objection overruled. He may answer.

"THE WITNESS: Yes it does.

"MR. CARTIN:

"Q What does it reflect about E. Reece?

"MR. WEISS: I am going to object to that. May I voir dire this person?

"THE COURT: You may.

"MR. WEISS: I am going to object to it as immaterial and irrelevant. But I would like to voir dire.

"THE COURT: Very well."

After reading the foregoing and the similar futile efforts of the defense counsel to develop any continuity of testimony by the other witnesses for the defense, we must agree that the interruptions were frequent, baseless in most cases, and a hinderance to the defense. There can be no justification for such conduct.

As we said in State v. Moore, 108 Ariz. 215, 495 P.2d 445 (1972) "[m]isconduct alone will not cause a reversal, as a new trial should not be granted to punish counsel for its misdeeds, but where the defendant has been denied a fair trial as a result of the actions of counsel, we will reverse." 108 Ariz. at 222, 495 P.2d at 452. This is a case in which, while we deplore the conduct of Mr. Weiss, a reading of the entire transcript does not reveal that the defense

was effectively prevented from presenting his case and we find no reversible error.

Defendant also contends that the County Attorney suppressed evidence beneficial to the defendant:

"MR. CARTIN:

"Q Were you told to take a picture from Apartment 'B' looking to the park area?

"MR. WEISS: Object. Immaterial and irrelevant.

"THE COURT: Objection overruled. He may answer.

"THE WITNESS: Yes, a request was made that a photo be taken from, I believe it was Apartment 'B', looking across into the ball field.

"MR. CARTIN:

"Q Was that photograph taken?

"A Yes, sir, it was.

"Q By you?

"A Yes, sir.

"Q So you did take a picture from Apartment 'B'?

"A Yes, sir, I did.

"Q Where is that photograph?

"MR. WEISS: Object. Immaterial and irrelevant.

"THE COURT: Objection overruled. He may answer.

"THE WITNESS: I don't know where it is. I don't have it in my possession.

"MR. CARTIN:

"Q Do you know who you gave it to?

"A The original picture was given to Mr. Weiss.

"MR. CARTIN: Your Honor, I ask that that picture be produced.

"MR. WEISS: Object. Not entitled to this picture.

"THE COURT: Objection sustained."

The only question is whether the picture is inconsistent with the State's theory of the case or whether the picture provides evidence favorable to the defense. In State v. Altman, 107 Ariz. 93, 482 P.2d

460, the court said: "[i]n the instant case, there is no allegation that the prosecution suppressed evidence favorable to the defendant; therefore, the failure of the trial court to grant Appellant's motion was not reversible error." 482 P.2d at 464.

Under the existing rules, the defendant is required to show more before he is entitled to the picture.

### DEATH PENALTY

We have not, in this opinion, discussed issues involving the death penalty. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972). In accordance with our announced policy in this regard, the death penalty is set aside and reduced to life imprisonment. State v. Taylor, 109 Ariz. 267, 508 P.2d 731 (1973); State v. Chatman, 109 Ariz. 275, 508 P.2d 739 (1973); § 13–1717, subd. B A.R.S.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.